UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SETON COMPANY,

        Plaintiff,

v.                                      Case No. 02-71118

LEAR CORPORATION,                Honorable Patrick J. Duggan

        Defendant.

_____/


## OPINION AND ORDER DENYING LEAR CORPORATION'S RENEWED MOTION FOR JUDGMENT AFTER TRIAL AND, ALTERNATIVELY, FOR A NEW TRIAL

At a session of said Court, held in the U.S.
District Courthouse, Eastern District of
Michigan on September 27, 2005.

PRESENT:  THE HONORABLE PATRICK J. DUGGAN
                  U.S. DISTRICT COURT JUDGE

This diversity lawsuit, filed January 29, 2002, arises from a contract between

Plaintiff Seton Company ("Seton") and Defendant Lear Corporation ("Lear"), pursuant to

which Lear agreed to buy cut-to-pattern leather from Seton for seats Lear manufactured

for General Motors Corporation ("GM"). On May 17, 2005, a jury trial began on Seton's

then remaining anticipatory repudiation and promissory estoppel claims. The jury

began deliberating on May 25, after seven days of trial testimony, and reached a jury

verdict the same day in favor of Seton on its anticipatory repudiation claim.[1] Presently

---

[1]The jury verdict form instructed that, if the jury entered a verdict in Seton's favor on its anticipatory repudiation claim, the jury should not enter a verdict with respect to Seton's promissory estoppel claim.

before the Court is Lear's Renewed Motion for Judgement After Trial and Conditionally and Alternatively for a New Trial, filed pursuant to Federal Rules of Civil Procedure 50 and 59.

## Motion for Judgment Notwithstanding the Verdict

At the close of Seton's case and prior to closing arguments, Lear moved for a judgment notwithstanding the verdict. Lear now renews its motion, raising the following arguments to support its claim that Seton's anticipatory repudiation claim fails:

I.  Lear never made an unequivocal and unqualified statement to Seton that Lear would not or could not use Seton in the future.

II.  Seton admits, in any event, that Lear had a right to de-source Seton under the terms of the alleged "life of the program" agreement.

III.  The "life of the program" agreement is unenforceable under the Statute of Frauds set forth in Michigan's Uniform Commercial Code ("UCC") because no writing was signed by Lear.

IV.  The "Merchant Exception" to the Statute of Frauds does not apply because the November 23, 1999 letter from Seton to Lear fails to meet the required elements of the exception, specifically it was not a "writing in confirmation" of an oral agreement and was not sent within a "reasonable time."

V.  Seton's claims are precluded by its agreement with GM, subsequent to Lear's breach, pursuant to which GM contracted directly with Seton for the leather Seton would have provided to Lear.

Lear further argues that Seton's promissory estoppel claim fails because Lear did not make a "definite and clear" promise to Seton for the "life of the program" and because the claim cannot be used to escape the requirements of the UCC's Statute of Frauds.

## Applicable Standard

In federal court diversity cases, such as this, " '[the Sixth Circuit] adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict.' " *Mannix v. County of Monroe*, 348

F.3d 526, 531-32 (6th Cir. 2003)(quoting *J.C. Wyckoff & Assoc. v. Std. Fire Ins. Co.*, 936 F.2d 1474, 1482 (6th Cir. 1991)).  As the Sixth Circuit has described, "[u]nder Michigan law, which is nearly identical to the federal standard, 'a judgment as a matter of law may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence.' "  *Perceptron, Inc. v. Sensor Adaptive Mach., Inc.*, 221 F.3d 913, 918 (6th Cir. 2000)(quoting *Ridgway v. Ford Dealer Computer Servs., Inc.*, 114 F.3d 94, 97 (6th Cir. 1997)).  In other words, " '[o]nly if the evidence . . . fails to establish a claim as a matter of law, should a motion for judgment notwithstanding the verdict be granted.' "  *Mannix*, 348 F.3d at 532 (quoting *Orzel v. Scott Drug Co.*, 449 Mich. 550, 537 N.W.2d 208, 212 (1995)).  "In evaluating the sufficiency of the evidence, [the court] must examine the evidence and take all legitimate inferences in the light most favorable to the non-moving party."  *Perceptron*, 221 F.3d at 918 (citing *Matras v. Amoco Oil Co.*, 424 Mich. 675, 385 N.W.2d 586, 588 (1986) and *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 565 N.W.2d 401, 409 (1997)).

### Law governing Seton's anticipatory repudiation claim

The doctrine of anticipatory repudiation provides:

> "if a party to a contract, prior to the time of performance,
> unequivocally declares the intent not to perform,
> the innocent party has the option to either sue immediately for
> the breach of contract or wait until the time of performance."

*Paul v. Bogle*, 193 Mich. App. 479, 493, 593 N.W.2d 630, 640 (1999)(quoting *Brauer v. Hobbs*, 151 Mich. App. 769, 776, 391 N.W.2d 482 (1986)).  As the United States Supreme Court has explained, an anticipatory repudiation occurs when a promisor renounces " '[a] contractual duty *before* the time fixed in the contract for . . .

performance.' " *Franconia Assoc. v. United States*, 536 U.S. 142, 143, 122 S. Ct. 1993, 2002 (2002)(quoting 4 A Corbin, Contracts § 959, p. 855 (1951)(emphasis in original)). "It is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." *Paul*, 193 Mich. App. at 493, 593 N.W.2d at 640 (citing *Carpenter v. Smith*, 147 Mich. App. 560, 565, 383 N.W.2d 248 (1985)). Where a repudiation is alleged to have been made orally, the language used " 'must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.' " *Id.* at 494 (quoting 2 RESTATEMENT CONTRACTS (SECOND) § 250). With regard to repudiation by acts, "a party's act must be both voluntary and affirmative, and must make it actually or apparently impossible for him to perform." *Id.*

I.    **Whether reasonable minds could differ, based on the evidence presented at trial, with respect to whether Lear made an unequivocal and unqualified statement to Seton that Lear would not or could not use Seton in the future**[2]

Viewing the evidence and all legitimate inferences in the light most favorable to Seton, the Court finds sufficient evidence supporting the jury's finding that Lear unequivocally and without qualification repudiated the parties' life of the program agreement. Seton's witnesses testified that Lear unambiguously denied the existence of any life of the program agreement at a meeting between Seton and Lear representatives on January 23, 2003. For example, Ingo Griessmann and Cindy Brown testified that they were told by Steve Hayworth at the January 23 meeting that the agreement between Seton and Lear did not constitute a life of the program contract.

_____

[2]This is the issue as set forth by Lear in its renewed motion. However, as discussed later in this Opinion, Lear has misstated the issue. The issue presented to the jury was whether Lear repudiated the "life of the program agreement"– not whether Lear stated that it would nor or could not use Seton in the future.

*See* 5/18/05 A.M. Tr. at 68 & 119. According to Ms. Brown's summary of the January 23 meeting in an e-mail sent to Griessmann later that day, in response to Griessmann's statement that Seton understood that it and Lear had a long term contract for GMT 800, Hayworth said "he was not aware of any long term agreement and if [Griessmann] was referring to the letter he sent to [Lear] in 1999, this is not an agreement since it is not signed by Lear." *See* Mot. Ex. 2. This is consistent with Hayworth's statement to Griessmann in an e-mail sent a few weeks prior to the meeting, in which Hayworth writes– with respect to the November 23, 1999 letter– "I would say that this does not constitute a life time agreement." *See* Resp. Ex. N.

Lear in fact acknowledges that ". . . Lear did indicate at [the January 23] meeting that it did not believe that the duration of the parties' agreement was the life of the program' . . ." *See* Mot. at 3. Lear argues, however, that because "Lear never stated that it would not or could not use Seton as a supplier for GMT 800 leather," Lear's statement "cannot constitute anticipatory repudiation as a matter of law." *See id.* at 4. This Court disagrees.[3]

Seton introduced evidence establishing that the duration of the contract was an essential term. As Seton's witnesses testified, Seton only was willing to pay rebates to Lear and sell its product to Lear for a specified price based on Lear's life of the program promise. *See, e.g.,* 5/17/05 P.M. Tr. at 12. In this Court's opinion, repudiation of an essential part of a contract constitutes repudiation of the contract. Notably, the parties

---

[3]For this reason, the Court believes Lear has framed the anticipatory repudiation issue too narrowly. In other words– as Lear phrased the issue– Lear could repudiate the contract by stating that it would not or could not use Seton in the future. However, Lear also could repudiate the contract by denying the existence of an essential term of the parties' contract.

agreed to special interrogatory #4 on the jury verdict form which asked the jury, "Did Lear anticipatorily repudiate any such *life of the program agreement*" (emphasis added) and further agreed that if the jury answered "yes" to that question, then it should determine the amount of damages to be awarded to Seton.

The Court concludes that this evidence, when viewed in a light most favorable to Seton, was sufficient for the jury to conclude that the statements made by Lear's representatives were "sufficiently positive to be reasonably interpreted to mean that the party will not . . . perform. *Paul*, 193 Mich. App. at 494, 593 N.W.2d at 640.

II.     **Whether the terms of the agreement between Seton and Lear gave Lear the right to de-source Seton under the circumstances of this case**

According to Lear, the evidence established that it had an unconditional right to terminate the parties' agreement and change leather suppliers before the end of the GMT 800 program. While this was the view advanced by Lear's witnesses, Seton's witnesses in fact disputed this claim. When the testimony provided by Seton's witnesses is reviewed in its entirety, it is clear Seton presented evidence from which the jury could find that Lear did not have a right to de-source Seton under the circumstances of this case. *See, e.g.,* Resp. Ex. B at 88 (Griessmann explaining that the statement in the 11/23/99 letter that the agreement is "in addition to current business practices" meant only that Lear would have the right to de-source Seton for such reasons as lack of delivery or large quality problems).

III.    **Whether the "life of the program" agreement is enforceable under the UCC's Statute of Frauds**

Pursuant to the UCC, contracts for the sale of goods for $1,000 or more, to be enforceable, must be contained in a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement

is sought or by his authorized agent or broker." MICH. COMP. LAWS ANN.

§ 440.2201(1). There was no writing, signed by Lear, evidencing its promise to buy

leather from Seton for the life of the GMT 800 Program. The UCC, however, provides

for the following so-called "Merchant's Exception" to the Statute of Frauds:

> Between merchants, if within a reasonable time a writing in
> confirmation of the contract and sufficient against the sender
> is received and the party receiving it has reason to know its
> contents, it satisfies the requirements of subsection (1)
> against the party unless written notice of objection to its
> contents is given within 10 days after it is received.

MICH. COMP. LAWS ANN. § 440.2201(2). Lear contends the writing Seton sent to Lear

on November 23, 1999, does not satisfy the requirements of this exception because it

(1) was not sent within a reasonable time and (2) did not sufficiently "confirm" an

existing oral contract between the parties.

A.     Whether Seton's November 23, 1999 letter was sent within a
       "reasonable time"

The UCC provides that when the statute requires an action to be taken within a

reasonable time, "[w]hat is reasonable . . . depends on the nature, purpose and

circumstances of such action." MICH. COMP. LAWS ANN. § 440.1204(2). Decisions of

the Michigan courts provide little guidance with respect to whether the delay in this case

was "reasonable" under the UCC's Merchant's Exception. In one case, however, the

Michigan Court of Appeals remanded the matter to the trial court indicating that the trier

of fact should determine whether a delay of a little more than four months between the

oral contract and confirmatory memorandum was reasonable under the statute. *Barron

v. Edwards*, 45 Mich. App. 210, 216, 206 N.W.2d 508, 511 (1973). As the Michigan

court instructed: " 'What is reasonable must be decided by the trier of the facts under all

the circumstances of the case under consideration.' " *Id.* (quoting *Azevedo v. Minister*,

471 P.2d 661, 666 (Nev. 1970)); *see also St. Ansgar Mills, Inc. v. Streit*, 613 N.W.2d 289, 295 (Iowa 2000)(stating that "the reasonableness of time between an oral contract and a subsequent written confirmation is ordinarily a question of fact for the jury.")  In an unpublished opinion, the Sixth Circuit refused to establish a per se rule that a six and one-half months delay was unreasonable as a matter of law, finding that the entire circumstances must be considered in determining whether the delay was reasonable. *Tel-Treads v. Montgomery Ward & Co.*, No. 84-5774, 1985 WL 13617, *4 (6th Cir. August 20, 1985).

As the Iowa Supreme Court emphasized in *St. Ansgar Mills*, "[i]t is only in rare cases that a determination of the reasonableness of conduct should be decided by summary adjudication."  *Id.* (citing *Harvey v. Great Atl. & Pac. Tea Co.*, 388 F.2d 123, 125 (5th Cir. 1968)).  In most of the cases this Court reviewed where the delay was found to be unreasonable as a matter of law, the courts did not rely solely on the amount of time expired between the oral agreement and confirming writing; instead, the courts found that other circumstances rendered the delay unreasonable.  *See, e.g., Starry Constr. Co. v. Murphy Oil U.S.A., Inc.*, 785 F. Supp. 1356, 1362-63 (D. Minn. 1992)(finding six months delay unreasonable in contract for sale of oil where buyer only sent alleged confirming memorandum two months after price and demand for oil increased significantly as a result of Iraq's invasion of Kuwait and after supplier refused to ship requested amount); *Bureau Serv. Co. v. King*, 721 N.E.2d 159, 161-62 (Ill. App. Ct. 1999)(finding delay of eight months unreasonable based on nature, purpose, and circumstances surrounding the buying and selling of grain, particularly the volatility of the market). Generally, courts have found delays unreasonable because the goods were sold in volatile markets, the market price had changed significantly from the time

the oral agreements were reached until the confirmatory letters were sent, and the dispute in the parties' lawsuits involved price. Here, in comparison, although one Lear witness testified that the market for cut-to-pattern leather is volatile, there was no evidence that the price had changed between the oral agreement and Seton's confirming letter. Moreover, it does not appear that Seton and Lear have ever disagreed upon the contract price in this case.

Based on the circumstances of this case, as established by the evidence, the Court believes reasonable minds could differ as to whether Seton's delay in sending the written confirmation was reasonable. First, there is no dispute that Showich and DuRoss reached some kind of oral agreement in late October 1998. As the Sixth Circuit explained in *Tel-Treads*, one purpose behind the "reasonable time" requirement is that it provides some basis for believing a contract has been formed, "[t]he longer the delay in reducing the agreement to some form of writing, the less the probability that there ever was a contract in the first place." *Id.* Therefore where there is no dispute that a contract exists, this Court believes the length of any delay becomes less significant.

Additionally, there was evidence that the parties modified the agreement between Showich and DuRoss at least one time after October 1998. As Showich testified, in April 1999, Seton agreed to extend the rebates it was required to pay Lear to include South African business. *See* Resp. Ex. A at 44-45. Lear's former employee Mark Kilbourn testified that this modification only was finalized on or about September 29, 1999. *See id.* Ex. F at 42. The jury reasonably could have determined that it should calculate the length of any delay based on the date the oral agreement, as modified, became final. And Steven Hayworth from Lear conceded that "it would not be unusual" for a party to wait thirteen months to send a confirming memorandum of an oral contract

when there was an oral modification subsequent to the actual agreement and the confirmation was sent after the modification.  *See id.* Ex. G at 66-67.

Finally, in determining whether any delay was reasonable, courts have considered the relationship of the parties and their conduct pursuant to their alleged contract during the period between the alleged oral agreement and written confirmation. *See, e.g., Gestetner Corp. v. Case Equip. Co.*, 815 F.2d 806, 810 (1st Cir. 1987)(finding delay reasonable in light of merchants' relationship and their immediate action following oral agreement which was consistent with their duties under the agreement); *Serna, Inc. v. Harman*, 742 F.2d 186, 189 (5th Cir. 1984)(finding delay reasonable in light of parties' interactions and non-fluctuation of prices between oral agreement and confirming memorandum); *Ansgar Mills, Inc.*, 613 N.W.2d at 295-96 (reversing district court finding that large amount of sale, volatile market conditions, and lack of explanation for grain seller's delay in sending confirmation letter rendered delay unreasonable and advising that other relevant factors should have been considered, including fact that parties maintained a long-standing amicable business relationship and had engaged in many other similar business transactions without incident).  Therefore in this case, where the parties began transacting business pursuant to the agreement and continued to do so without incident for some period after the oral agreement was reached but before the written confirmation was sent, a reasonable jury could conclude that the delay was reasonable.

### B.     Whether Seton's November 23, 1999 letter was a "writing in confirmation" of the parties' oral agreement

Lear contends that Seton's November 23, 1999 letter did not confirm an existing oral agreement, as a matter of law.  The Merchant's Exception requires a writing that is

"sufficient against the sender." MICH. COMP. LAWS ANN. § 440.2201(2). A writing is sufficient against the sender "if the writing indicates that 'a contract for sale has been made between the parties' and 'specifies a quantity term.' " *Lorenz Supply Co. v. Am. Standard*, 419 Mich. 610, 614, 358 N.W.2d 845, 846-47 (1984)(citation omitted). According to Lear, Seton's letter did not indicate that a contract had been made; rather the letter merely constituted an offer.

First Lear argues that Ingo Griessmann, the author of the letter, "consciously" changed a sentence in the closing paragraph which read in a draft: "We . . . hope that the above *assists* you in *the* understanding of this agreement" to "We . . . hope that the above *meets* with *your* understanding of this agreement."[4] *See* Mot. at 8 (emphasis added by Lear). The jury, however, may have believed that Lear was placing too much emphasis on these changes while ignoring the remaining statements in the letter. For example, Griessmann began the letter by emphatically stating: "please find below *the agreement reached by* Mssrs. M. Duross [sic], Director of Purchasing for Lear Corporation and N. Showich, Vice President of Sales and Marketing for Seton Company." *See id.* Ex. 5 (emphasis added). Clearly a reasonable jury could conclude from this statement alone that Seton was confirming an existing agreement, not that it was making an offer.

_____

[4]Lear also argues that the letter does not confirm a past promise, but instead speaks in terms of what Lear will agree to do in the future. Specifically, Lear notes that Griessmann wrote: "Lear *is to award* Seton the entire GMT 800 Program." Lear asserts that if an agreement already had been reached, Griessmann would have written: "Lear has awarded Seton the entire GMT 800 Program." The Court believes that a reasonable jury may have disregarded this argument, finding that Lear was placing too much emphasis on individual word choices (more specifically tenses) instead of reading the letter as a whole (particularly as the words on which Lear focused were not the words crucial to an understanding of the parties' agreement).

Lear further points out that Griessmann closed the letter by asking Lear to take

further action by countersigning.  Griessmann in fact did request that Jerry Cave (the

recipient at Lear) "[k]indly return with acknowledgement [sic] signature" and Griessmann

did include a line for Cave's signature.  In cases involving documents with similar

language, however, courts have held that the documents satisfied the Merchant's

Exception.  *See, e.g., GPL Treatment, Ltd. v. Louisiana-Pacific Corp.*, 914 P.2d 682,

689 (Or. 1996)(holding that document satisfied Merchant's Exception even though it

included signature lines after "SIGN CONFIRMATION COPY AND RETURN" and

"ORDER ACCEPTED BY:" reasoning that the document did not indicate any intent on

sender's part not to be bound until other party signed and returned); *Busby, Inc. v.

Smoky Valley Bean, Inc.*, 767 F. Supp. 235, 236 (D. Kansas 1991)(holding that letter

otherwise satisfying Merchant's Exception did not become an offer because the letter

stated "[p]lease sign below and return the attached duplicate copy"); *cf. Great W. Sugar

Co. v. Lone Star Donut Co.*, 567 F. Supp. 340, 342 (N.D. Tex. 1983), *aff'd* 721 F.2d 510

(5th Cir. 1983)(finding that memorandum stating "Please sign and return to me the

enclosed counterpart of this letter *signalling* [sic] *your acceptance of the above

agreement*" and that agreement automatically terminated "unless it is signed by the

[recipient]" did not satisfy exception as it required further action)(emphasis added); *Int'l

Meat Traders, Inc. v. H & M Food Sys.*, 70 F.3d 836, 839-40 (5th Cir. 1995)(upholding

district court's finding that writing did not satisfy the Merchant's Exception where

language "[r]ead and agreed by buyer" was followed by signature line for buyer's

signature); *Kline Iron and Steel Co. v. Gray Communications Consultants, Inc.*, 715 F.

Supp. 135, 141-42 (D. S.C. 1989)(holding that seller's letter and subsequent "proposal"

were not confirming memoranda under exception because letter advised that a written

contract would be sent separately and directed the buyer to sign and return one copy of the proposal for the seller's "execution" and proposal itself provided that it was for buyer's "immediate acceptance" and that its terms could be modified or withdrawn by seller without notice prior to such acceptance).  Seton's November 23, 1999 letter did not *require* Lear to take an additional step in order to indicate its acceptance of the letter's terms.  Therefore, as these cases suggest, the Court does not conclude as a matter of law that the letter merely was an offer.

To further support its argument that the November 23, 1999 letter merely constituted an offer, Lear points out that employees at Seton and Lear referred to the letter itself as the "agreement" and that Seton's counsel argued that the letter was an offer.[5]  The jury's specific finding that the November 23, 1999 letter constituted a writing in confirmation of the parties' oral agreement, however, is supported by the evidence.  The Court does not believe that the jury's finding should be disturbed simply due to the term the parties' employees used to refer to the letter or because of any alternative arguments made by Seton's counsel to the Court, particularly as the argument never was submitted to the jury.

**IV.    Whether Seton's claim was precluded by its agreement with GM, subsequent to Lear's breach, pursuant to which Seton contracted directly with GM for the leather Seton would have provided to Lear**

Lear argues that Seton is not entitled to recover on its breach of contract claim because Seton subsequently entered into a contract with GM that would have enabled Seton to mitigate its damages, but for GM's subsequent breach.  As the Court instructed the jury with respect to damages, Seton was not entitled to any loss it could have

---

[5]This argument was made to the Court in response to Lear's motion for directed verdict at the close of Seton's case.

13

prevented by exercising reasonable care and diligence. As the Court further instructed the jury, it was Lear's burden to prove that Seton failed to minimize its damages and that damages should be reduced by a particular amount as a result.

One problem with Lear's present argument, as Seton points out, is that insufficient evidence was introduced to show that Seton entered into a binding agreement with GM. In fact there was evidence to the contrary– that is, while Seton and GM entered into negotiations in June 2002, no written agreement ever was signed. *See, e.g.*, Resp. Ex. I at 71-72. Additionally, while Griessmann acknowledged that Seton reached some kind of oral agreement with GM, the terms of the agreement were never presented to the jury. Therefore Lear failed to present evidence from which the jury could conclude that the agreement covered entirely the same business for the same period of time as the agreement between Seton and Lear. *See* Mot. Ex. 3 at 4 & 91-93. Finally, while there was evidence that Seton reached some kind of agreement with GM in mid 2002, there also was testimony that GM subsequently cancelled or breached the agreement. *See* Reply Ex. 4 at 94. From this evidence, the jury may have concluded that Seton exercised reasonable care and diligence to mitigate its damages but was not successful. Lear has not presented any case law or statute to support its assertion that Seton was required to seek damages from GM before it could recover its total damages from Lear.

**V.     Whether Seton's Promissory Estoppel Claim Failed as a Matter of Law**

Lear argues that there was insufficient evidence of a "clear and definite" promise by Lear to Seton for the life of the program agreement and therefore Seton's promissory estoppel claim should not have been submitted to the jury. While Showich testified that he could not remember DuRoss' specific words during their negotiations, Showich

14

further testified that he had no doubt he and DuRoss agreed to a life of the program provision. Showich testified that the life of the program provision was part of the initial quote from Seton to Lear, that DuRoss agreed to the term early in their negotiations, that because the term was assumed there was no need to discuss it further, and that when Showich summarized the terms of his and DuRoss' agreement– including that it was for "the life of the parts"– DuRoss replied "we got a deal." *See, e.g.,* 5/17/05 P.M. Transcript at 41; 56-59. The Court therefore finds that there was sufficient evidence to submit Seton's promissory estoppel claim to the jury.

Lear also argues that Seton should not have been permitted to put forth a promissory estoppel claim to evade the requirements of the Statute of Frauds. The Michigan Court of Appeals has held that the Statute of Frauds does not bar claims of promissory estoppel where the plaintiff presents evidence that he or she relied on the defendant's promise. *Lovely v. Dierkes*, 132 Mich. App. 485, 490-91, 347 N.W.2d 752,753-54 (1984). While the Michigan Court of Appeals has since questioned the continued viability of *Lovely* on the basis that principles of separation of powers preclude a court from overriding the legislatively created Statute of Frauds, *Crown Technology Park v. D & N Bank, FSB*, 242 Mich. App. 538, 548 n.4, 619 N.W.2d 66 (2000), no Michigan court has overruled the decision.

**Motion for New Trial**

Lear seeks a new trial pursuant to Rule 50(c) of the Federal Rules of Civil Procedure, or alternatively pursuant to Rule 59. Lear contends a new trial is necessary based on the following:

I.     The admission of the June 26, 2000 facsimile from Andreas Mader to Ingo Griessmann describing Seton's November 23, 1999 letter as an "agreement."

II.  The admission of evidence indicating that GM no longer was interested in water buffalo when Lear was representing to Seton that GM in fact was interested in switching to water buffalo.

III.  The Court's failure to instruct the jury that "secret intentions are insufficient to show repudiation."

**Applicable Standard**

Rule 59 of the Federal Rules of Civil Procedure provides that upon motion of a party, the Court may grant a new trial following a jury verdict "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . ."  FED. R. CIV. P. 59(a).  "By general rule, the granting of a new trial is a matter purely within the discretion of the trial court . . ."  *Hopkins v. Coen*, 431 F.2d 1055, 1059 (6th Cir. 1970)(citation omitted).  Where a party seeks a new trial based on the trial court's admission of certain evidence, whether a new trial should be ordered is evaluated under the "substantial right" standard.  *Beck v. Haik*, 377 F.3d 624, 634 (6th Cir. 2004).  As the Sixth Circuit has explained this standard:

> The inquiry involves an assessment of the likelihood that the error affected the outcome of the case.  As the Supreme Court has described the test: "[I]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."  *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248, 90 L.Ed. 1557 (1946).  Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision.

*Haik*, 377 F.3d at 634-35 (quoting *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988)).  Obviously the court first must determine whether it made an evidentiary error during the trial.  *Id.* at 635.  If so, then the court must "examine the proceedings in their entirety . . . in light of the proofs at trial, to determine whether the

errors affected substantial rights." *Id.* (quoting *Kotteakos*, 328 U.S. at 762, 66 S. Ct. 1239).

**I.     The admission of the June 26, 2000 facsimile from Andreas Mader to Ingo Griessmann describing Seton's November 23, 1999 letter as an "agreement."**

At trial, Seton introduced a facsimile from Andreas Mader, a Lear employee in Europe, to Ingo Griessmann at Seton, dated June 26, 2000.  In his e-mail, Mader sought rebates from Seton "[a]ccording to the agreement from 23 November 1999 with Lear Corporation . . ."  *See* Mot. Ex. 19.  Lear objected to Seton's admission of the e-mail, contending that Seton was attempting to use the facsimile to suggest that its November 23, 1999 letter was an agreement, contrary to Seton's claim that the letter was a confirmatory writing.  While the Court agreed that the letter was not relevant as proof of a separate agreement between Seton and Lear (that is a contract separate from the agreement reached by Showich and DuRoss) the Court found the facsimile relevant to the issue of whether Lear believed– prior to this dispute– that it had a binding agreement with Seton pursuant to the terms set forth in the November 23, 1999 letter.  *See* 5/17/05 P.M. Tr. at 90-91.  The Court does not believe that it erred in its ruling.

In any event, the Court does not believe that the introduction of this evidence affected Lear's substantial rights.  First, although Seton argued to the Court that the November 23, 1999 letter was an offer, this argument was not made to the jury.[6]  In closing arguments, Seton only argued that Showich and DuRoss entered into an oral

_____

[6]To the extent Seton's counsel referred to the letter as an "agreement" in opening or closing statements, the Court specifically instructed the jury that nothing either counsel said during these statements constituted evidence.  *See* 5/25/05 Tr. at 170.

agreement in late 1998, which Seton confirmed in writing in the November 23, 1999 letter. *See* 5/25/05 Tr. at 75-109. Along these lines, the Court's instructions and the special verdict form indicated to the jury that the first question it had to decide was whether an oral agreement was reached by Showich and DuRoss in late 1998. *See id.* at 175 & 180. Only if the jury answered yes to that question was it to decide whether the November 23, 1999 was a written confirmation of the oral agreement. *See id.* at 180-81 and Verdict Form. The jury never was instructed to consider whether Mader's facsimile or the November 23, 1999 letter constituted agreements enforceable against Lear. Thus regardless of the description of the November 23, 1999 letter provided by Lear's employees or others, the Court finds with fair assurance that the jury was not misled into believing that the letter was itself an agreement between Seton and Lear.

**II.      The admission of evidence regarding Seton's knowledge that GM decided not to pursue water buffalo when Lear was representing to Seton that GM in fact was interested in switching to water buffalo.**

Lear contends that evidence regarding its knowledge concerning GM's decision not to pursue water buffalo was legally irrelevant and should not have been admitted at trial. Lear argues that Seton introduced this evidence– which showed what Lear's employees knew when they met with Seton's employees on January 23, 2002– in order to show that Lear's employees were lying at the meeting when they told Seton's employees that, if GM wanted water buffalo, Seton would be de-sourced. According to Lear, this evidence improperly led the jury to believe that Lear's secret intentions were relevant in deciding whether it repudiated the parties' agreement.

Contrary to Lear's assertion, Seton's counsel did not state that Lear's unexpressed knowledge (i.e. that GM did not want Water Buffalo) was "critical." What counsel stated is as follows:

18

> Steve Hayworth [Lear] replied that the customer wants water
> buffalo.  Not "if" the customer wants water buffalo.  he said,
> "The customer wants water buffalo."  And both Mr.
> Griessmann and Ms. Brown and Mr. Cave agree what was
> said, "The customer wants water buffalo."  And so if the
> customer wants it, they will be providing it.  Customer wants
> it, they're going to give it to the customer.  But there's no
> doubt the customer wanted water buffalo.
>
> Okay.  Now, saying that is already telling Seton
> unequivocally, "You don't have– your not going to be doing it
> to 2003, because we know from the testimony that Lear
> produced that Seton had not provided a [water buffalo] plan.
> There was no way that Seton could provide the water buffalo
> for 2003.  That's telling them, you know, you're out of
> business on 2003.  Basically, you're not going to get the
> 2003 model.

*See* 5/25/05 Tr. at 98-99. Thus what Seton's counsel argued was "critical" was Lear's

unequivocal statement that GM wanted water buffalo *and that therefore* Lear would be

providing water buffalo.  In other words, Seton's argument was not that Lear's

employees represented that GM wanted water buffalo when in fact, they secretly knew

that GM did not want it.  Seton's argument was that Lear unequivocally stated that its

client wanted water buffalo and therefore Lear would no longer be purchasing cowhide

leather from Seton.  Seton only argued that Lear's statement was relevant because it

informed Seton that Lear would not be purchasing leather from Seton for the upcoming

model year. In any event, the Court clearly instructed the jury that the only evidence

relevant to determine whether Lear repudiated the contract was what Lear "distinctly

t[old]" or "through its actions clearly show[ed]" Seton.  *See id.* at 176.

The Court further notes that it did not err in allowing Seton to present evidence of

GM's decision regarding water buffalo, as that evidence was relevant to other issues the

jury had to decide.  For example, Seton introduced this evidence to show that GM

abandoned any plans to switch to water buffalo for the GMT 800 program and thus

Seton was entitled to damages for the entire period that it would have been supplying cowhide leather to Lear under the parties' agreement. Moreover, the Court points out that in the two instances noted by Lear in which it objected to the introduction of this evidence, it objected only on foundational grounds (*see* Mot. Ex. 11 at 63) and because questions by Seton's counsel exceeded the scope of direct examination (*see id.* Ex. 7 at 63-64). In other words, at trial, Lear did not argue that the introduction of this evidence would lead the jury to believe that secret intentions were relevant to Seton's anticipatory repudiation claim.

## III.     The Court's failure to instruct the jury that "secret intentions are insufficient to show repudiation."

Lear argues that the Court erred when it refused to instruct the jury that "secret intentions are insufficient to show repudiation." The Court instructed the jury with respect to Seton's anticipatory repudiation claim in accordance with Michigan's standard jury instruction. *See* Mich. Model Jury Instr. 140.15. Contrary to the representations made by Lear's counsel, the law in Michigan was not modified or changed after this standard instruction was issued in January 1987. Therefore, the Court found no reason to modify the standard jury instruction.[7] The Court believes that the instruction given adequately set forth the law in Michigan with regards to anticipatory repudiation, particularly that it only "occurs when a buyer distinctly tells, or through its actions clearly shows" the seller that is relevant to assessing whether a repudiation occurred. *See*

---

[7]Lear's counsel cited *Paul v. Bogle*, 193 Mich. App. 479, 493, 593 N.W.2d 630, 640 (1999), to support his assertion that there was a modification or change in the law after the model instruction was issued. The problem with counsel's argument, however, is that the court in *Paul v. Bogle* merely was quoting from an earlier opinion which had been issued two years before the standard jury instruction was issued: *Carpenter v. Smith*, 147 Mich. App. 560, 565 (1985). In fact, the *Carpenter* court merely was restating the law as set forth in American Jurisprudence 2d of Contracts. *See id.*

5/25/05 Tr. at 176.

## Conclusion

For the reasons set forth above, the Court concludes that judgment should not be entered as a matter of law with respect to Seton's anticipatory repudiation and promissory estoppel claims.  Additionally, the Court does not find any error in the proceedings that may have affected Lear's substantial rights.  Thus the Court also concludes that Lear is not entitled to a new trial.

Accordingly,

**IT IS ORDERED**, that Lear's renewed motion for judgment after trial is **DENIED**;

**IT IS FURTHER ORDERED**, that Lear's motion for a new trial is **DENIED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Robert L. Begleiter, Esq.
Lyle D. Russell, Esq.
Kimball R. Anderson, Esq.
Thomas J. Tallerico, Esq.
Phyllis Golden Morey, Esq.